UNITED STATES, Ex rel. GEORGE T. LANGLEY,
*vs.*

SAYLES J. BOWEN Et Al.

SAME Ex rel JAMES E. TARTON.

SAME Ex rel BOYD.

1. The Acts of Congress of January 8, and February 5, 1867, and the joint resolution of March 30, of that year, construed and the powers and the duties of the judges of election in making the registry of qualified voters defined.
2. Where the time is fixed by statute for the hearing of applications to the board of judges of elections to add to or omit from the list of voters the names of particular persons, a petition to this Court for a writ of mandamus to compel the board to register the petitioner's name will be dismissed as premature when the board has not yet held its sessions for hearing such applications.

At Law.   Decided May 11, 1867.

Application for writs of mandamus against the judges of registration to compel them to reopen the registration books and to allow the petitioners to register therein as legal voters of the District.

The Facts are sufficiently stated in the opinion of Mr. Justice Olin.

Messrs. Joseph H. Bradley, R. T. Merrick and W. Y. Fendall for petitioners.

Messrs. Wm. A. Cook and A. G. Riddle for respondents.

Mr. Justice Olin said:

This is an application on the part of George T. Langley for a writ of mandamus to be issued against Bowen and others, judges of election appointed by this Court, in pursuance of an Act of Congress, approved February 5, 1867, commanding said judges to place upon the registry of voters

the name of the petitioner as a qualified voter of this District.

Upon the presentation of the petition to this Court a rule was granted for the respondents to show cause, upon a day named, why this writ should not issue. The respondents appeared in pursuance of the rule and interposed their answer to the petition.

The material facts stated in the petition, which is verified by the oath of the petitioner, are as follows: That he has resided in the District of Columbia for the period of more than one year from the 30th day of April last; that he had been for a period of more than three months before that date a resident of the Third Ward, in the City of Washington, in said District, and proposed at said date and does still propose to continue to reside in said ward in said city; that he is a male person, not a pauper, and not under guardianship; that he has not been convicted of any crime or of any infamous offense, and has not voluntarily given aid and comfort to the rebels in the late rebellion; that he is a qualified voter, entitled to vote at the elections in said city, under the laws of the United States; that for twenty-five years past preceding the date of this petition he has been a tax payer and a qualified voter under said laws of the United States, and from time to time he openly voted at the election in said City of Washington.

And the petitioner further states that on the said 30th day of April last, and whilst the said judges of election were sitting for the purpose of discharging the duties devolved upon them by the act of Congress heretofore mentioned, preparing a list of the persons qualified to vote in said city at said election, he (the said petitioner), presented himself in person to said judges and demanded that his name should be placed on the registry or list of persons qualified to vote in the Third Ward of the City of Washington, claiming to possess the qualifications of a legal voter, as particularly set forth in the notice made a part of

his petition, and marked "Exhibit A." This exhibit represents the petitioner to be a native citizen of the United States; to have resided in the District of Columbia for more than the period of one year preceding this date, and a resident of the Third Ward of the City of Washington for three months preceding said date; is neither a pauper nor a person under guardianship; is upwards of twenty-one years of age; and has not been convicted of any infamous crime or offense; and that he has not voluntarily given aid and comfort to the rebels in the late rebellion; and that he is a qualified voter under the laws of the United States; and that being informed that his name had been omitted by the board of registration in making up the registry for the Third Ward he demanded to have said omission corected, and his name entered on the registry according to law.

The petitioner further states that the said judges of election then and there refused to enter his name upon the said registry of persons qualified to vote in the city of Washington, and that they still refuse so to enter the same.

The petition concludes by asking this Court to grant a writ of *mandamus* commanding the said judges of election to enter the name of the petitioner upon the list of qualified voters of the third ward of this city.

The respondent, in answer to the rule to show cause state, among other things, that they gave public notice of the times and places in which they would hold sessions to register the names of all persons qualified to vote in said city, which notice was published in the various newspapers of the city, and in reference to the third ward of the city is as follows:

"Notice is hereby given to all qualified voters in the third ward, that the judges of elections appointed to register voters under the act of Congress approved February 5th, 1867, entitled "An Act to punish illegal voting in the District of Columbia, and for other purposes," will be in session

at the council chamber, City hall, on Monday, Tuesday, Wednesday, and Thursday, April 1st, 2d, 3d, and 4th, from three to seven o'clock in the afternoon, for the purpose of receiving and recording their names."

They further aver, that while they remained in session for the said third ward, in which the said relator, George T. Langley, claims to reside, he did not appear at any time or place, nor ask in any manner to be enrolled as a voter of said ward; nor have they any information or knowledge that he was such a voter, or that he claimed or desired to be so regarded, and that it was not until after the sessions for the said Third Ward were closed, and they were engaged in the preparation of a list of persons qualified to vote in the Seventh Ward, that he appeared and claimed to be a voter in the Third Ward, and served on them a notice, a copy of which accompanies the petition, and is marked "Exhibit A."

They further aver that said Langley did appear in the Seventh Ward, and that an oath was administered to him by Peter F. Bacon, one of the said judges, and that Langley then stated that he knew of the time and place of the registration of voters in said Third Ward, and that he voluntarily remained therefrom ; and that at the time of his said appearance the said defendants informed him that they had made up the list of voters of the Third Ward, and were engaged in preparing that of the Seventh Ward, and had not the books of the Third Ward present, and that they would not then enter his name ; that they did not then, nor have they since entered his name on the list of voters in the said Third Ward, but for reasons herein set forth and others, they declined and still decline to do so.

They further answer, that at the present time they have no knowledge or information as judges, or otherwise, to satisfy them that he, Langley, is a qualified voter of said ward and city under the provisions of the act of Congress in such case made and provided; nor can they admit that

he has not voluntarily given aid and comfort to the rebels, or that he has not been convicted of crime, or any of the other allegations of his petition as regards his claim or right to vote in said city.

They further aver that they have prepared lists of persons qualified to vote in the several wards of the said city of Washington, including the said Third Ward; and that a copy of the lists so prepared for said Third Ward was posted up in public places according to the act of Congress of February 5th, 1867.

These are believed to be all the material facts in the case of Langley against the judges of election. The question raised by the petition and answer of the defendants is, namely, " What is the proper construction of the act of Congress creating these judges of election and commanding them to make a registry of the legal voters of the District? "

Some intimations were made in the argument of this case that the judges of election, having published a notice in newspapers of this city that they would sit on certain days mentioned in such notice to make a registration of the voters of a particular ward in the city, and that after having held such session and the petitioner having notice of such session, and without any valid excuse for not appearing before such board absented himself, that he is not entitled to be registered as one of the legal voters of this city although he afterwards came before said board when sitting to make a registry of the voters of another ward of the city and applied to be registered as a voter of said city.

An oath was tendered him, as I infer from the papers not as to his qualifications as a voter, but as to whether he had voluntarily abstained from appearing before the board, when public notice was given and brought home to his own personal knowledge, that the board of registration was sitting in his own ward to listen to applications of citizens who might claim to be entitled to be registered as legal voters;

that on admitting under the oath so administered that he was aware of the session of the board for the purpose of making a registry of the ward wherein he resided, the board refused to further consider his application, and declined to place his name upon the list of voters. Application is made to this Court for a writ of mandamus to compel the board to place him upon the registry of voters.

These facts raise the question of the true meaning and construction of the Act of Congress, relating to the qualification of voters in this District, and the powers and duties of the judges of election appointed by this Court in pursuance of the Act of February 5, 1867.

By an Act of Congress passed January 8, 1867, it was provided "That each and every male person, except paupers and persons under guardianship, of the age of twenty-one years and upwards, who has not been convicted of any infamous crime or offense, and excepting persons who may have voluntarily given aid and comfort to the rebels in the late rebellion, and who has resided in the said District for the period of one year and three months in the ward or election precinct in which he shall offer to vote next preceding any election therein shall be entitled to the elective franchise, and shall be deemed an elector, and entitled to vote in any election in said District, without any distinction of color or race."

By an act of Congress, approved February 5th, 1867, it was among other things enacted, "That there shall be five judges of election within and for the city of Washington, * * * "who shall hold their offices for two years, and until their successors shall be appointed and qualified, and whose duty it shall be, prior to each election, to prepare a list of persons qualified to vote in the several wards of said cities at any election; and said judges shall be in open session in the city of Washington, to receive evidence of the qualifications of persons claiming the right to vote at any election therein, and for correcting said lists on two days not

*26*

exceeding five days prior to each election for the choice of city officers, giving prior notice of the time and place of each session in some newspaper."

Under the joint resolution of Congress, passed March 30, 1867, among other things it was provided, "That it should be lawful for any of the judges of election to administer oaths in all cases relating to the duties assigned them by law, and any person wilfully guilty of perjury, should on conviction thereof, be subject to imprisonment for a term of not less than one or more than five years."

I have now quoted the substance of all the various acts of Congress in relation to this subject. It would seem to be a question of little doubt or embarrassment as to what were the duties of these judges of election, or rather judges of the qualification of voters in this District. It will be seen by the language of the third section of the act of February 5, 1867, that the Supreme Court of this District was empowered to appoint five judges of election for the city of Washington, who, it is declared, "shall hold their office for two years, and until their successors shall be appointed and qualified, and whose duty it shall be, prior to each election, to prepare a list of the persons qualified to vote in the several wards in said cities at any election, and that said judges shall be in open session in the city of Washington to receive evidence of the qualifications of persons claiming the right to vote at any election therein, and for correcting said lists on two days, not exceeding five days prior to each election for the choice of city officers giving prior notice of the time and place of each session in some newspaper."

By section fourth of the same act it is provided that prior to said election the judges in the respective cities shall put up a list of voters thus prepared in one or more public place in said cities at least ten days prior thereto.

The plain meaning of these provisions is that a duty was imposed upon the judges of elections of the City of Washington, to prepare a list of all persons who they believed to be

qualified voters under the acts of Congress before recited acting from honest motives, with reasonable diligence, and to put that list, thus prepared, in one or more public places in the city, at least ten days prior to the election. That these judges were to hold a session on two days not exceeding five days prior to the election, giving notice of the time and place of each session in some newspaper, at which session they were to receive evidence of the qualification of persons claiming the right to vote in any election therein, and for the purpose of correcting said lists so made of the voters of the city.

The mode adopted by these judges of elections to ascertain who were voters of the District under the provisions of the act of Congress, before quoted, was probably a very proper, prudent, and expressive mode of ascertaining who were the qualified voters of the District, and yet the act is entirely silent as to the means the judges of the election shall employ to ascertain who are the qualified voters of the District.

The question is reduced simply to this: A plain duty is imposed upon these judges to make a list of all persons they believe to be qualified voters in the District. It was their duty to record the name of every man they believed to be a qualified voter, whether such person made personal application to the board or not. They were to discharge this duty faithfully, honestly, diligently, to ascertain by the best means in their power who were the qualified voters of the District.

It was not their duty simply to inquire who desired to be registered as a voter of such District. It was their duty to place upon the list each and every person they honestly believed to be a qualified voter, whether such person made or omitted to make application to be registered as a voter of the District. After having performed this duty they were to put up a list of all the voters in said city in one or more public places and then, subsequently, to hold at least two days

session for the purpose of hearing application of voters to be placed on the list thus made, or for the purpose of hearing applications to reject from the list so made by them persons who were not qualified to vote, and until this final discharge of their duty the list of voters cannot be said to be complete.

The object of the statute in authorizing this board to assemble and correct the list, and hear evidence, was not only to strike from the list those persons who had been put on mistakenly, but to add to that list persons who were omitted.

It appears from the petition and return in the case of Langley, rather argumentatively than otherwise, that the board refused to place his name upon the registry because he had notice that the board was in session in the Third Ward, of which he was a resident, and omitted voluntarily to go before them; that for that cause he was not entitled to be registered as a legal voter of the District. I think the board erred in that respect. The law commanded them to make a registry of the legal voters of the District. The performance of their duty did not at all depend upon the fact whether a legal voter asked to be registered or not. If the board had reason to believe, and supposed him to be a legal voter, it was their duty to place his name on the registry, whether he did or did not make application to be registered.

In this case, although the board refused, for the cause mentioned, to place Langley's name upon the registry of voters at the time of his application, it is not, in my opinion, to be presumed that the board will ultimately, on the two days provided by statute for listening to each application, if he should find his name omitted from the list, refuse to examine into his qualifications as a legal voter and to place his name on the registry, if they find him qualified. For that reason, I think the rule to show cause why a writ of mandamus shall not issue in his case must be denied.

There are one or two other cases involving questions

somewhat distinct from the application of Langley that may be properly considered in this connection.

In the case of Boyd, who it would seem, made an application to be registered while the judges of election were sitting for that purpose in the ward in which he resided, and claimed to be entitled to vote, objection was raised to his being enrolled on the ground of his having been convicted of an infamous offense, and therefore not entitled to vote under the act of Congress referred to.

It is sworn to in Boyd's petition that he was convicted of aiding certain slaves to escape from this District, which, by the then existing law, was made a penal offense, punishable by imprisonment in the penitentiary, and that in pursuance of such conviction he was sentenced in two cases for the respective terms of seven years each; it further appears that he presented to the judges of election, as at the time of his application, a full pardon granted by the President of the United States for the offense of which he was convicted.

With these facts before us the question to be considered in his case is whether the pardon granted by the President restores Boyd to all his rights as a citizen of the District. It would seem, from the decision in the case of *ex parte* Garland, recently made in the Supreme Court of the United States that upon this question there is scarcely room for argument.

The judges of election have taken the precise letter of the statute, which says: That no person convicted of any infamous crime or offense shall be permitted to vote. They have regarded this conviction which consigned Boyd to prison for seven years, and declared by the act felony to be an infamous offense.

Whether this offense comes within the meaning of the term " infamous offense," as known to the common law, it is unnecessary here to inquire, for I think where a full and free pardon was granted to Boyd that he stood in precisely the name relations of citizenship as though no such offense

had been committed and no conviction had been had. The meaning of the statute, in my judgment is that no person, who has been convicted of an infamous offense from the pains and penalties of which offense he has not been relieved by a full pardon, is entitled to vote, and that his name, if application be made, should not be placed upon the registry.

The case of Turton is substantially like that of Langley, with this exception, that it is alleged that the judges of election, or one of them, tendored to him an oath, which he refused to take, and that in consequence of such refusal they declined to register his name as a voter. It is not set out in the return, as it ought to be, what oath was administered, or was proposed to be administered to him, which he declined to take. Under the provisions of the joint resolutions before referred to, it is provided that it shall be lawful for the said judges of election to administer oaths in all cases relating to the duties assigned them by law. Now, the duties assigned them by law were, first, to make a registry of the legal voters of the District, which they were to do with diligence, faithfulness and care, exercising their best judgment as to who were and who were not qualified voters.

On such list being completed, it was to be published and posted in one or more public places. They were then to sit for at least two days for the purpose of correcting and examining that list. They might unquestionably administer an oath to any applicant whose name had been omitted from the list, and who claimed to be placed thereon, or to any person whose name had been put upon the list, and ascertaining from him, under oath, whether he was possessed of the requisite qualifications. They might, in my judgment, go further. They might hear proofs in contradiction of the affidavit of the application to be put upon the list, or to be removed, or whom it was proposed to erase from the list; and, if on such occasion the applicant refused to

answer all the questions which necessarily involved his qualifications as a voter, the board might very properly reject that application. If he in his affidavit swore that he possessed all the qualifications required by the act of Congress to constitute him a legal voter, the board might have contradictory testimony on that subject; and if there should be in such case evidence both for and against the party as to his qualifications as a voter, the judges of election are the only tribunal appointed by law to decide that question.

It was argued at much length, that the board was invested with judicial or *quasi* judicial powers, in making up this registry; that in some way they were to exercise their discretion upon the subject and their decision was final and conclusive. The use of the word "discretion" has no application whatever in my judgment. They were assigned a plain duty; they were to perform that duty according to their best judgment. The question of a person's qualification as a voter of this District, where evidence pro and con is submitted to the board, must be determined by the board according to their best judgment. There is no discretion whatever to be exercised. If they believe from the facts presented that the applicant is possessed of the requisite qualifications, they are so to decide and place his name upon the registry; if, from the evidence adduced before them they come to a different conclusion, they are to reject him. It is their duty to do so; there is no discretion about it. So far as they do act in judging from evidence adduced before them as to the qualifications mentioned in the act of Congress which constitute a voter in this District, they are independent of our control. They are not, however, permitted to refuse to register a voter on any such capricious ground as that he has not applied to the board for registration at any time within five days preceding the day of election.

I conclude, therefore, that the rules in these cases to show

cause why a mandamus should not issue against the judges of election should be discharged.

Mr. Justice Wylie said :

The act of Congress passed on the 8th of January, 1867, declares that from and after the passage of this act each and every male person, excepting paupers and persons under guardianship, of the age of twenty-one years and upwards, who have not been convicted of any infamous crime or offense, and excepting persons who may have voluntarily given aid and comfort to the rebels in the late rebellion, and who shall have been born or naturalized in the United States, and who shall have resided in the said District for the period of one year and three months in the ward of election precinct in which he shall offer to vote next preceding any election therein, shall be entitled to the elective franchise, and shall be deemed an elector and entitled to vote at any election in said District without any distinction of color or race.

The act of February 5, 1867, section three, provides " that there shall be five judges of election within and for the City of Washington, and three within and for the City of Georgetown, the same to be appointed by the Supreme Court of the District of Columbia, who shall hold their offices for two years and until their successors shall be appointed and qualified, and whose duty it shall be, prior to each election, to prepare a list of the persons qualified to vote in the several wards of said cities in any election; and said judges shall be in open session in their respective cities to receive evidence of the qualification of persons claiming the right to vote in any election therein, and for correcting said lists, on two days not exceeding five days prior to each election for the choice of city officers, giving prior notice of the time and place of each session in some newspaper."

Section 4, "that prior to said election the said judges in the respective cities shall post up a list of voters thus pre-

pared in one or more public places in said cities, and at least ten days prior thereto."

Another and more recent act declares that no person shall be admitted to vote at an election whose name has not been placed on the list of voters, as provided for in the above act.

These respondents were appointed by this Court judges of election in pursuance of this latter statute. They proceeded without delay to make out the lists of qualified voters in each ward of this city, commencing with the First ward, and taking up afterwards the other wards in their numerical order. Public notice was given inviting all persons qualified as voters to come forward and have their names entered upon the lists, and abundant opportunity was given for that purpose.

The relator in this case was a qualified voter of the Third ward, but he neglected to claim to have his name placed upon the list; and it was, therefore, not so entered at the time when the judges were engaged in making out the list of the voters in that ward.

After the list for this ward had been completed and published, and posted in hand bills as required by law, and after all the intermediate wards had been disposed of in the same manner, till the whole work was completed except that that of the Seventh and last ward, the relator then presented himself to the judges and demanded to have the list of the Third ward opened and his name registered. This request was refused by the judges, and the relator thereupon applied to this Court for a mandamus to compel the judges to comply with his demand. The Court granted a rule on the defendants to show cause why that mandamus should not be issued as prayed, and they have presented their answer, which states in substance the facts above set forth, and also a great many other circumstances, which I make no account of, as being wholly unessential.

*27*

The law prescribes no time within which the several lists are to be completed, except only that they shall all have been made out and published at least ten days prior to the election. The list of the Third ward might have been kept open up to the last day, and then published along with those of the other wards; but this was a matter which the law left to the discretion of the judges; and they closed the list and had it published on or about the 30th of April, more than a month before the day of the next election. They pursued the same course as to each of the other wards as the lists were severally completed in their order.

It is not pretended by the relator that abundant opportunity was not offered him to have his name entered upon the list of voters of his ward prior to the completion and publication of that list; but his complaint is that the respondents refused to open the list after its completion and publication, and at a time when they were engaged in making out the list of voters in the Seventh ward. If a *mandamus* were to be issued in this case it would be impossible for the judges to close or publish any list till the very last moment allowed by law for that purpose, for there might be other applications of the same character made every day, and in each one of the wards, so that in this way every list would have to be kept open, or closed and again opened every time any one should require his name to be registered. But the law allows the judges to close the list at any time they may deem it complete, except that this must be done at least ten days before the election.

For the purpose of affording an opportunity for correcting errors in the prepared lists, the law requires judges to hold an open session of two days, not more than five days prior to each election, of which notice is to be given by public advertisement. The ensuing election will not be held till the third day of June next, therefore the time prescribed by the law for correcting the errors of the lists has

not yet arrived. We are not permitted to presume bad faith or abuse of their powers on the part of the judges; certainly no *mandamus* can be allowed in anticipation of such conduct on their part. Judicially we have no knowledge that any persons qualified as voters have been omitted from the list except the present relator and three others who have made similar applications. The two days will be ample opportunity to those persons to apply and have their names registered if they be duly qualified voters. It is said, however, that there is a very large number of other persons in the same situation, whose cases have not been presented to the Court, and that the two days may not prove sufficient for the correction of the lists. If that should turn out to be the case, it will be a misfortune to those who desire to have their names on the lists, and it may be unfortunate for the public interests. But that is an evil which may never happen, and if it should the fault of the law or the neglect of the sufferers in refusing to avail themselves of their opportunity cannot be cured by *mandamus* at this time.

It is further represented that these judges may refuse the register to names of persons qualified to vote who had wilfully or purposely neglected to have their names registered when the first opportunity was afforded them in several wards.

We cannot now act upon any such anticipated refusal of the judges to perform their duty. The fair and reasonable construction of this provision of the law cannot be mistaken by any unbiased or well disposed mind. If the party applying at that time be otherwise qualified, the judges will have no right to say he shall not have his name registered because of his previous refusal. His having declared formerly that he would not have his name placed upon the list is not a forfeiture of his franchise by any voter. The qualifications of the voters are prescribed by the law, and the disqualifications are also plainly declared; and the judges

have no right at their pleasure, or for any reason whatever, however satisfactory it may seem to them to add to or detract one jot or tittle from the law.

Should any qualified voter be refused the right to have his name placed upon the list of voters on either of the two days on any such grounds as this, it will then be time enough for him to apply for a mandamus. Or, if he should not choose to seek redress in that way, or the time be too short to furnish the opportunity, or the Court not be in session, he may have another remedy in an action for damages· In Ashby *vs.* White, 2 Ld, Raymond R., 958, Chief Justice Holt said: "Let all people come in and vote fairly. It is to support one or the other party to deny any man's vote. By my consent, if such an action comes to be tried before me, I will direct the jury to make him pay well for it."

In making this quotation, I beg to disavow any intention to adopt the threat which it contains as applicable to those respondents, but I have used it for the purpose of intimating to them the serious responsibilities they are under in the performance of the duties of their office.

I entertain not a particle of doubt that they have heretofore aimed honestly to discharge all the obligations imposed upon them by the law, and that they will continue to do so to the end, and upon the two days appointed by law for the correction of the lists of voters in the several wards every duly qualified voter who shall apply to have his name registered shall have his request complied with and that they will not undertake to inquire what he may have formerly said about his intentions in that respect. It is not their concern what he may have said, but only to inquire whether he possesses the qualifications by the act of Congress.

These principles are, with immaterial variations, applicable to all the other applications for mandamus now before us, none of which can be granted.

MR. JUSTICE FISHER said :

I concur in all the views expressed by Mr. Justice Olin, except with regard to the character of the crime of which Dr. Boyd had been convicted, and the effect of the pardon. I do not look upon any offense as infamous that is not *malum in se*—a crime regarded as infamous by the enlightened reason of humanity.

Had Dr. Boyd been convicted of such a crime, I do not believe that the pardon of the President would have the effect to render him a legal voter in this District. I am aware that a pardon has the effect to relieve a party who has been convicted by judgment of Court in a criminal case of the penalty that should be imposed by the law governing the case, but this act is not a criminal statute. The right to say whether anybody or nobody shall vote in this District is solely vested in the National Legislature.

I think, therefore, that the name of Dr. Boyd should be placed upon the registry of voters of the District.